IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )
                                    )
v.                                  )      No. 3:05-CR-105
                                    )      (VARLAN/GUYTON)
MALIK DEWAYNE HARDIN,               )
                                    )
              Defendant.            )

**REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28

U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District

Court as may be appropriate.

This case came before the Court on March 17, 2006 for an evidentiary hearing on the

defendant's Motion to Suppress Evidence [Doc. 18]. Assistant United States Attorney David

Jennings was present for the government. Attorney John E. Eldridge was present representing the

defendant, Malik Hardin ("Hardin"). The defendant also was present. Following the taking of

evidence, the parties waived the filing of post-hearing briefs and proceeded to argument. Following

argument, the Court took the Motion and the government's Response [Doc. 20] under advisement

on March 17, 2006.

The defendant has been indicted [Doc. 1] on a three-count indictment, alleging (1)

that the defendant possessed crack cocaine with the intent to distribute, (2) that he possessed a

firearm in furtherance of crack cocaine trafficking, and (3) that he was a felon in possession of three

firearms. The indictment alleges that the defendant committed all three of these offenses on August

29, 2005. It was on that date when law enforcement officers executed an arrest warrant for the defendant and took him into custody, while at the same time seizing crack cocaine from his person and three firearms from the apartment in which the defendant was arrested [Doc. 20].

The defendant has moved to suppress [Doc. 18] all items of evidence seized in connection with his arrest on August 29, 2005, specifically, "firearms, drugs, documents, money and/or statements," alleging that:

> 1) The officers lacked probable cause to enter the apartment for the purpose of executing an arrest warrant for the defendant,
>
> 2) The officers conducted an illegal search without a warrant, and all evidence seized must be suppressed as fruit of the poisonous tree, and
>
> 3) Even if the officers had probable cause to enter the apartment, the officers found the three firearms in question pursuant to an illegal search of the apartment which exceeded the permissible limits of a protective sweep [Doc. 19].

In addition to these grounds, at oral argument on the Motion to Suppress, the defendant alleged that the officers did not "knock and announce" before entering the apartment, and that the government presented no evidence linking ownership of the three firearms to Hardin.

The government responds [Doc. 20] that the officers had probable cause to enter the apartment based on a confidential tip, confirmed by the apartment manager, that the defendant was inside the apartment. The government further alleges that the search of the defendant's person, resulting in the seizure of crack cocaine and cash, was a valid search incident to arrest, and that the firearms were seized pursuant to a legal protective sweep search. In addition, the government argues that the manner of entry was reasonable and lawful under the circumstances of this case, and that Hardin's ownership of the three firearms seized is an issue for the trial.

# I.  FACTS

The government's first witness was Ed Kingsbury ("Kingsbury").  Kingsbury is an investigator with the Knoxville Police Department ("KPD") and has been a KPD officer for thirteen (13) years.  His primary responsibilities are narcotics investigations and participation in the Smoky Mountains Fugitive Task Force (the "Fugitive Task Force").  Kingsbury testified that the primary job of the Fugitive Task Force is to take arrest warrants and apprehend fugitives.  He stated that the Fugitive Task Force executed state or federal arrest warrants, or in some cases both at the same time.

Kingsbury testified that in the Summer of 2005, he learned that the defendant Hardin was a fugitive.  During this time period, he received an arrest warrant for Hardin, and he began an investigation into Hardin's whereabouts.  He was working with Jason Tarwarter ("Tarwarter") and Becky Gambill, both Deputy United States Marshals, who also were members of the Fugitive Task Force.

Kingsbury testified that he knew Hardin from the time period of approximately 1996, when KPD Officers arrested Hardin after Hardin was involved in a series of armed robberies and shootings.  Kingsbury said he was familiar with the defendant's criminal history, which included prior offenses involving firearms and shootings.

On August 29, 2005, Kingsbury received information from a confidential informant that Hardin was staying in an apartment at the Applewood Apartments on Wimpole Avenue in Knoxville.  Kingsbury stated that the confidential informant also provided information with regard to the vehicle Hardin was driving.  Kingsbury and Tarwarter went to the Applewood Apartments and, in the parking lot of those apartments, found a vehicle matching the description given by the confidential informant.  Kingsbury and Tarwarter then talked with the apartment manager.

3

Kingsbury testified that they identified to the manager the specific apartment about which they had received information regarding Hardin. The manager advised them that Hardin was not on the lease for that apartment, but that the apartment was rented to Germaine Reynolds. Kingsbury testified that he looked at the lease and verified the name of the tenant.

Kingsbury testified that he showed the manager a photograph of Hardin, but that the manager could not identify him as someone who had been on the property. Kingsbury advised the manager of Hardin's criminal history. Kingsbury testified that the manager was shocked to learn about Hardin, and that the manager said that if Hardin was on the property, the manager did not want him there. In further conversations with Kingsbury, it was decided that the manager would enter the apartment under the ruse of checking for a water leak, and once inside, the manager would look to see if Hardin, in fact, was in the apartment. Kingsbury testified that he watched the manager go into the apartment. When the manager returned, Kingsbury again showed the manager the photograph of Hardin. The manager confirmed that Hardin was in the apartment.

Kingsbury testified that he then decided to call for uniformed officers for the safety of everyone involved, based on Hardin's history of using violence and firearms. Kingsbury testified that the uniformed officer arrived before entry was made into the apartment. Kingsbury testified that he made a plan for a four-person team to enter the apartment, because of his concern that Hardin would be armed. Kingsbury explained that this concern was based on Hardin's criminal history.

Kingsbury testified that he got a master key to the apartment from the manager. He then testified as to the manner in which the entry was made by four officers into the apartment. Those officers were Kingsbury, Tarwarter, Investigator Maupin ("Maupin"), and Sergeant Jared Turner ("Turner"), of the KPD.

4

Kingsbury testified that each member of the entry team performed a specific job. Tarwarter took down Hardin while he was being covered by Maupin. Simultaneously with that occurring, Kingsbury looked for weapons in the immediate vicinity of where Hardin was found inside of the front room of the apartment. Kingsbury testified that he wanted to clear the area around Hardin to make sure that Hardin did not get free and grab a weapon which he could use to harm the officers. Kingsbury testified that he saw Hardin as soon as entry was made into the apartment. Kingsbury said that as Tarwarter was taking down Hardin, Kingsbury flipped up cushions on the couch and love seat where Hardin had been sitting, looking for weapons. He then testified that under a cushion on the couch next to where Hardin had been sitting, he found a firearm. Exhibit 3 was received into evidence. This is a picture of the couch and love seat where the defendant was sitting when the officers made entry into the apartment, showing cushions flipped up. Kingsbury testified that he was flipping up these cushions looking for weapons as Tarwarter was taking down Hardin behind him. Exhibit 4 was received into evidence. This is a photograph of the gun which Kingsbury found under the cushion, shown in the position he found it. Kingsbury testified that the distance between the couch and the edge of the sofa where Hardin had been sitting was eight to ten (8-10) inches. Kingsbury further stated that the gun in this photograph was within arm's reach of Hardin as the officers entered the apartment.

While Kingsbury, Tarwarter, and Maupin were in the front room of the apartment, Turner conducted a security check of the rest of the apartment. Kingsbury testified that the purpose of this was for officer safety so that no one could harm them while their backs were turned dealing with Hardin. Kingsbury testified that Turner was in uniform.

5

On cross examination, Kingsbury testified that he received the tip from the confidential informant on August 29, 2005. Kingsbury testified that the arrest of Hardin occurred at approximately 2:00 p.m. and that the tip was received during the morning hours, although he was not sure of the exact time. Kingsbury testified that the tip was given in person, not over the telephone. Kingsbury testified that while interviewing a confidential informant on other matters, he asked the confidential informant if the confidential informant knew Hardin, and the confidential informant said yes. The confidential informant then told Kingsbury that he knew where Hardin was, because the confidential informant had purchased crack cocaine from Hardin. Kingsbury testified that he assumed that the confidential informant had purchased the crack cocaine from Hardin at the apartment in question. The confidential informant gave the location of the specific apartment, but not the apartment number. The confidential informant also gave a description of the vehicle which Hardin was driving. Kingsbury testified that the description given was of a tan colored four-door vehicle, possibly a Chevrolet Caprice. According to Kingsbury, the confidential informant did not say how long Hardin had been staying at that apartment or exactly the last time he had seen him there. Kingsbury testified that he thinks he recalls the confidential informant saying that a girl lived in the apartment, but that he did not know her name.

Kingsbury testified that this particular confidential informant had never given information to Kingsbury before, although he may have given information to other officers. On August 29, 2005, the confidential informant had come in to give information on a crack dealer, and according to Kingsbury, all of the information which the confidential informant provided in that regard was true.

Kingsbury testified that despite the information from the confidential informant, he would have followed up with an investigation of the informant's information before he went into an apartment. Kingsbury testified that he would not have believed that he had probable cause to enter the apartment based solely on the information provided by the confidential informant, even though the confidential informant told Kingsbury exactly where the apartment would be located within the Applewood Apartments complex.

Exhibit 1 was received into evidence. This is the lease for apartment no. 48, which the manager showed Kingsbury, indicating the name of the lessee as Germaine Reynolds, not Hardin. Exhibit 2 was received into evidence. This is a photograph of the front of the apartment building in which apartment no. 48 was located.

Kingsbury testified that the first name of the apartment manager was Craig, but that he does not recall the manager's last name. Kingsbury testified that Craig was in the manager's office when Kingsbury arrived at the manager's office, and further, Craig stated to Kingsbury that he was the manager of the Applewood Apartments. Kingsbury testified that he gave Hardin's criminal background information to the manager. Kingsbury testified that this background included a shoot out with police officers approximately ten (10) years before and a robbery spree. Kingsbury testified that he knew of no other information in the following ten (10) years which would indicate violence on the part of Hardin, but Kingsbury added that Hardin was in jail during this time period.

Kingsbury testified that he told the manager about the tip from the confidential informant and that Kingsbury needed to investigate further to make sure that Hardin was inside the apartment. Kingsbury testified that it was his idea that the manager go into the apartment, and that the manager wanted to do so. Kingsbury testified that he helped the manager make up a story about

a possible water leak in order to get into the apartment. The manager saw a photograph of Hardin before he went inside the apartment. The manager came out of the apartment and told Kingsbury that Hardin was in the apartment, in a back bedroom talking on a cell phone. Kingsbury testified that the manager possibly said there is no one else in the apartment, but the manager had only been asked to look for Hardin and therefore, Kingsbury did not assume that Hardin was alone in the apartment.

Kingsbury testified that he had no pre-entry intelligence as to the presence of guns in the apartment. The manager was not asked to look for guns.

Kingsbury testified that he felt that he had probable cause to enter the apartment for the purpose of arresting Hardin after the manager confirmed that Hardin was in the apartment. Kingsbury again testified that four (4) officers entered the apartment, and he reviewed the plan for entry and the duties of each officer. Kingsbury again testified that his job was to search the immediate area of Hardin for weapons while Tarwarter and Maupin were to take Hardin down to the floor and secure him in handcuffs. Kingsbury testified that as they entered the apartment, all of the officers screamed "police" and "get down on the ground," and that Hardin did get on the floor without resistence. Kingsbury testified that the officers went in as fast as possible, and that Hardin had no warning of the presence of the officers until the officers were actually entering the apartment and announcing "police."

Kingsbury testified that he immediately searched the love seat and couch by lifting the cushions. This is how he saw the gun. Kingsbury testified that while looking under cushions, he did not know the status of the defendant, because his back was turned to the defendant, Tarwarter, and Maupin. Kingsbury testified that after he saw the weapon, he immediately put himself between

8

the weapon and the defendant for officer safety. He then turned, and it was at that moment that he first saw that the defendant was cuffed and secure on the floor.

Exhibit 5 was received into evidence. This is a photograph of the couch and love seat. Kingsbury testified again that the gun was under one of the cushions. He again testified that at the time he found the gun, he immediately got between the weapon and the defendant and then checked on the status of the defendant. Kingsbury testified that it was only then that he saw that the defendant was under control.

Kingsbury testified that when he entered the apartment, he was not aware of any recent threats which Hardin had made. Kingsbury also testified that he does not recall if anything violent was alleged in the arrest warrants which he was executing on Hardin.

With regard to the apartment manager and the pre-entry conversation about Hardin, Kingsbury stated that the manager said, "I don't want him here; I'll go [into the apartment]."

Kingsbury testified that the officers took a total of three (3) guns into custody. Kingsbury testified that two (2) other guns were found in the bedroom by Turner. Kingsbury also testified that an amount of currency, as well as crack cocaine, was found in Hardin's pockets. Kingsbury testified that some amount of marijuana also may have been found in Hardin's pockets. He was not exactly sure of that, because he did not do the pat down on the defendant.

Kingsbury testified that he was not concerned with destruction of evidence during this event. Kingsbury testified that his only concern when he entered the apartment was to make the arrest of Hardin. Kingsbury further testified that when the defendant was on the floor and under control, the gun on the couch would not have been within his reach. Kingsbury testified that he does not recall if he "ran the tags" on the car which may have been driven by the defendant. Kingsbury

recalls the confidential informant saying it was a tan Caprice. Kingsbury further testified that vehicles driven by defendants in drug cases rarely are registered in their own names. Kingsbury also testified that the manager did not say that he saw anyone else in the apartment after he went in looking for Hardin, but Kingsbury added that the manager did not look for anyone else.

On re-direct examination, Kingsbury testified that no officers moved the sofa or the love seat. Kingsbury further testified that evidence gathering was not on his mind when he entered the apartment. He testified that only officer safety and apprehending the defendant were on his mind. Kingsbury testified that he did not know that the defendant was under total control until he turned around after seeing the gun. Kingsbury testified that he did not believe that the love seat had been pushed back during the arrest of Hardin, because there was a table behind it which would have prevented it from being moved.

The government's next witness was Jason Tarwarter ("Tarwarter"). Tarwarter testified that he is a Deputy United States Marshal and has held that position for approximately ten (10) years. He testified that one of his duties was to work arrest warrants for the Fugitive Task Force. Tarwarter testified that he received a federal arrest warrant for the arrest of the defendant in the summer of 2005. Exhibit 7 was received into evidence, that being the arrest warrant which Tarwarter signed as executed for the defendant Hardin.

Tarwarter testified that on August 29, 2005, Kingsbury called him, advising that Kingsbury had obtained information on the location of Hardin. Kingsbury did not tell Tarwarter who provided the information. Later that day, Tarwarter drove with Kingsbury to the Applewood Apartments, and there found the vehicle in the parking lot which had been identified as the vehicle Hardin was driving. Tarwarter then went with Kingsbury to the manager's office and talked with

the manager and gave him background information on Hardin. Tarwarter testified that the manager volunteered to go into the apartment to see if Hardin was present in the apartment. After he returned from the apartment, according to Tarwarter, the manager identified Hardin based on a photograph and confirmed that he was in the apartment.

Tarwarter testified that he was the third person through the door of the apartment as part of the entry team. Tarwarter testified that his role was to put Hardin in custody and that this was his sole focus. Tarwarter testified that Hardin complied with orders to get down on the floor, and Tarwarter put cuffs on him. Tarwarter testified that he did not see what Kingsbury, Maupin or Turner did while he was focused on Hardin. Tarwarter testified that he did not specifically tell Hardin that he was "under arrest." Tarwarter testified that it was obvious when he put the handcuffs on Hardin that he was under arrest.

Tarwarter testified that he then did a search incident to arrest of Hardin's person. Tarwarter testified that he found and seized crack cocaine, marijuana, and approximately two thousand ($2,000) dollars in currency from Hardin's pockets. Tarwarter testified that he saw the guns, but only later after the defendant had been put in a marked vehicle for transport.

With regard to the vehicle alleged to have been driven by Hardin, Tarwarter testified that all he remembers is that it was a late 80's or early 90's model Caprice, maybe tan in color.

On cross-examination, Tarwarter testified that on entry into the apartment, he went straight to Hardin. He testified that Hardin got on the floor, and that Tarwarter put handcuffs on him as quickly as possible. Tarwarter testified that Hardin was physically cooperative. Tarwarter testified that it took only moments to put the cuffs on Hardin. Tarwarter testified that while he was doing this, the other officers were behind him, and he could not see them or what they were doing.

Tarwarter reviewed Exhibits 5 and 6, photographs of the area where Hardin was taken into custody. Tarwarter testified that the take down was conducted on the floor, to the right of the coffee table, with the defendant's head facing between the table and the wall. Tarwarter testified that the defendant's feet were approximately one to two (1-2) feet from the couch when he was on the ground and handcuffed. Tarwarter then drew on Exhibit 6, indicating the location of Hardin on the floor while being handcuffed, with his head facing away from the couch.

Tarwarter testified that his first knowledge of a gun being in the apartment was when someone announced "weapon" while he had the defendant on the ground, cuffing him.

The government's next witness was Jared Turner ("Turner"). Turner testified that he has been a KPD officer for approximately nine (9) years. He currently holds the rank of Sergeant. Turner testified that on August 29, 2005, he provided a uniformed presence for the execution of the arrest warrant on Hardin. He went to the scene at the request of Kingsbury and Tarwarter. Turner testified that his job was to do a protective sweep of the apartment while the other three (3) officers took Hardin into custody and did a sweep of the immediate vicinity around Hardin. Turner testified that his major concern was that the defendant would be armed, and his role was to enter and do a protective sweep by going though the apartment and making sure that no one was in another room of the apartment. Turner testified that if he found someone else in the apartment, he would detain and search them for weapons. Turner testified that he was only looking for persons, not evidence, during the protective sweep of the apartment.

Turner testified that upon entry into the apartment, his sole focus was to scan the rest of the front room of the apartment, where Hardin was seated, while the other officers went to the defendant. Then he proceeded through the apartment. Exhibit 8 was received into evidence. This

12

is a diagram, not to scale, showing the relative positions of the rooms in the apartment. Turner testified that he cleared the kitchen, cleared the bathroom, including looking behind the shower curtain, cleared the bedroom next to the bathroom, and finally looked in the second bedroom adjacent to the kitchen. Turner testified that in the second bedroom, he saw a bed with a bedskirt, or sham under it. It appeared to him as though someone might be under the bed, because of the way an area of the sham poked out.

   Exhibit 9 was received into evidence. This is a photograph of the bed in the second bedroom, as it appeared to Turner. Turner testified that there was a sham under the bed and that a part of the sham was poking out in a manner which made him believe that it could be a foot. Turner testified that he kneeled down and lifted up the sham to check and make sure that there was not a person hiding under the bed. Turner testified that when he lifted up the bedskirt, he saw an open box with two black handguns in it. Turner testified that he immediately pulled the box out from under the bed and put it on the bed so as to get it out of reach of anyone who might be hiding under the bed. Turner testified that he then quickly looked again under the bed to clear it and make sure that there was no one hiding underneath. Exhibit 10 was received into evidence. This is a photograph of the bed with the box containing the guns on top of the bed. Turner testified that the position of the guns in the box was as he first saw them.

   On cross examination, Turner reviewed Exhibits 9 and 10 and indicated the place where the bed sham had been sticking out. Turner again testified that he felt it might be a person's foot where the sham was pressing out, and that is why he lifted it at that location.

   Turner testified that he arrived on the scene after the manager went into the apartment and came back out. Turner testified that he had not heard anyone crawling under the bed or any

other noise in the bedroom. Turner testified that he looked under the bed for the sole reason of making sure that no one was under the bed. Turner went on to testify that he would have looked under the bed to make sure that no one was underneath, even if he had not seen a part of the sham poking out as though indicating the presence of a foot. Finally, Turner testified that he did not know whose lease it was on the apartment or whether the defendant was the lessee of the apartment.

The government rested its evidence, and the defendant Hardin took the stand to testify for the limited purpose of describing the manager's entry into the apartment. At the outset of Hardin's testimony, the government stipulated that the defendant did have standing, as an overnight guest, to assert Fourth Amendment rights as to the apartment.

Hardin testified that he was talking on a cell phone with Germaine Reynolds when the manager knocked on the door. Hardin testified that he did not say anything when the manager knocked. Hardin said that he believes the door opened and that the manager said "maintenance." Hardin asked the manager what he wanted. Hardin testified that the manager stated that he wanted to come in to check for a water leak that might be coming from an upstairs apartment. Hardin asked Reynolds if it would be all right with her if the manager came in, and she said yes. Based on that, Hardin told the manager to come in and take a look. Hardin testified that the manager did not enter the back bedroom where Hardin was, but that the manager stood in the hallway and asked Hardin if he had heard any water running. Hardin said no. Hardin further testified that the manager did not enter either bedroom, and further that the other bedroom door was closed. Hardin testified that the manager then left and that Hardin got up and went to the door to make sure that it was locked. The government did not cross examine the defendant.

14

## II. ANALYSIS

### A. Probable Cause

The Fourth Amendment protects citizens against unreasonable searches and seizures, and in so doing, it guarantees the right of people to be secure in their persons and houses. U.S. Constitution amend IV. The defendant's Motion to Suppress Evidence [Doc. 18] relies on this constitutional protection, as well as the rights granted under the Fifth Amendment, to argue that the officers who entered Reynold's apartment on August 29, 2005 lacked probable cause to enter the apartment to execute an arrest warrant for the defendant. The defendant argues that the confidential informant's tip that Hardin was to be found in this particular apartment can not establish probable cause, because the confidential informant "did not meet the requisite levels of veracity, reliability, and or basis of knowledge to establish probable cause" [Doc. 19]. In addition, the defendant has argued that the government can not rely on the pre-entry information obtained by the apartment manager, alleging that the apartment manager was an instrument or agent of the government.[1]

The government counters that the officers did not rely on the confidential informant's tip for probable cause. Instead, the officers relied on the apartment managers's pre-entry confirmation that the defendant, in fact, was inside the apartment [Docs. 20 and 24].

---

[1]The Court earlier ruled on this issue, finding that the apartment manager was not an instrument or agent of the government [Doc. 30]. The analysis set forth in that Memorandum and Order need not be repeated here. However, it should be noted that testimony in the March 17, 2006 hearing did provide additional support for the Court's finding. Upon being advised about Hardin's fugitive status and criminal history, the apartment manager stated that if Hardin was staying on the property, the manager did not want him there, and that he wanted to go into the apartment to see if Hardin was inside. Clearly, the apartment manager expressed an independent motivation, connected to the business purposes of his employer, for entering the apartment to confirm the presence of the defendant. United States v. Howard, 752 F.2d 220, 227-28 (6th Cir. 1985).

15

A valid arrest warrant carries with it the authority to enter the home or residence of the person to be arrested. Payton v. New York, 445 U.S. 573, 602-603 (1980). However, the arresting officers must "have reasonable or probable cause to believe the person named in the warrant is within." United States v. Jones, 641 F.2d 425, 428 (6th Cir. 1981).

In the present case, Kingsbury testified that while he went to the Applewood Apartments based on the tip, he did not believe he had probable cause to enter the apartment until Hardin's presence inside the apartment was confirmed by the manager.

The defendant's testimony supported the testimony of Kingsbury and Tarwarter as to the apartment manager's conduct. The defendant testified that the manager did enter the apartment and have a conversation with him. Therefore, the defendant's testimony confirmed that the manager did have adequate opportunity to be able to identify the defendant and then to confirm to Kingsbury and Tarwarter the defendant's presence inside the apartment.

Therefore, the Court finds that the apartment manager did enter the apartment, have a conversation with the defendant, and then confirm to officers the presence of the defendant in the apartment by looking at a photograph of the defendant. Based on these findings, the Court holds that the officers did have probable cause to believe that Hardin, the person named in the arrest warrant, was within the apartment.

**B.  Knock And Announce**

The defendant argues, alternatively, that even if the officers had probable cause to enter the apartment, they failed to knock and announce their presence and identity as police prior to entry. The government counters that either no pre-entry knock and announce is required to

16

execute a valid arrest warrant, or the particular circumstances of this case, namely the defendant's history of shootings and violence, necessitated an unannounced entry for officer safety.

In support of his position, the defendant, during oral argument, cited four (4) cases to the Court, which are reviewed as follows.  In United States v. Nabors, 901 F.2d 1351 (6th Cir. 1990), federal agents, with a search warrant, made forced entry into the defendant's apartment within mere "moments" after knocking on the door and announcing that they were police with a search warrant.  As the agents entered the apartment, the defendant shot one of them in the face with a rifle.  The court held that the entry was lawful, because exigent circumstances existed, namely, the officers' reasonable belief that the defendant, who was a felon with convictions for possession of firearms and concealed weapons, might be armed and pose a threat to the safety of officers.  Id. at 1354.

In United States v. Bates, 84 F.3d 790, 793 (6th Cir. 1996), Shelby County, Tennessee sheriff's deputies, with a search warrant, forcibly entered defendant's apartment without first knocking and announcing their presence and identity as police.  As justification, the government argued exigent circumstances, one of which being that an informant said there was a firearm in the apartment.  However, one of the officers who entered the apartment testified at the suppression hearing that he had no information or facts indicating that the defendant was violent or would use a weapon when confronted by law enforcement personnel.  Id.  The court, citing Nabors, supra, ruled that "a verified reputation of a suspect's violent nature can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence."  Id. at 795.  In Bates, however, the court held that the entry was unlawful, because the government had

no evidence that the defendant was prone to violence or had a criminal history of using a weapon if confronted by law enforcement, or of other acts of violence. <u>Id.</u> at 796.

In <u>Ingram v City of Columbus</u>, 185 F.3d 579, 584-85 (6th Cir. 1999), plaintiffs filed a civil rights action against police officers, alleging, inter alia, that the officers, wearing plain clothes, entered their residence through the unlocked front door, while pursing a fleeing felony suspect, without first knocking and announcing their presence and identity as police. The plaintiffs alleged a violation of their Fourth Amendment rights. The officers did not have a warrant. The court, in analyzing Ingram's claim, stated that in order to justify an unannounced entry into an individual's home, the police must reasonably suspect that, under the circumstances, knocking and announcing their presence would be "dangerous or futile, or inhibit effective investigation of the crime." <u>Id.</u> at 588. The court went on to state that a case-by-case analysis is required to determine whether noncompliance with the knock and announce rule is excusable. <u>Id.</u> In <u>Ingram</u>, the officers basically asserted the "hot pursuit" doctrine. The court, however, held that the officers being in hot pursuit, without further justification, does not establish that knocking and announcing would have been dangerous or futile, or prevent effective criminal investigation. <u>Id.</u> at 589.

Finally, in <u>United States v. Smith</u>, 386 F.3d 753, 458 (6th Cir. 2004), the defendant sought to have evidence suppressed on the ground that the officers, who had a search warrant, violated the knock and announce requirement. In <u>Smith</u>, it was undisputed that the officers did not knock and announce before making forced entry into the residence. Therefore, the court, citing <u>Nabors</u>, supra, stated that exigent circumstances must have existed to excuse this noncompliance with the requirement. In holding that the entry was unlawful, the <u>Smith</u> court found that there were insufficient facts to support a conclusion that Smith, or anyone else in the dwelling, was likely to

use a weapon or become violent, or was any threat to officer safety. Id. at 759. In reaching this holding, however, the court stated that evidence that an occupant has "a criminal record reflecting violent tendencies. . . . can be enough to provide law enforcement officers with justification to forego the necessity of knocking and announcing their presence." Id. at 760, citing Bates, 84 F.3d at 795.

The courts in Nabors, Bates, Ingram, and Smith did not face the issue of knock and announce in the context of police executing an arrest warrant, as distinguished from a search warrant. In a footnote, however, the Ingram court remarked that "police officers are subject to the knock and announce rule when executing valid arrest warrants." Ingram, 185 F.3d at 588, citing Wilson v. Arkansas, 514 U.S. 927, 929 (1995). In Wilson, the police officers had a valid search warrant for the defendant's residence and a valid arrest warrant for the defendant. The officers, without a pre-entry knock and announce, entered the defendant's residence through an unlocked door, identifying themselves as police as they entered. The lower courts in the case had found that the Fourth Amendment did not require the knock and announce principle. The Supreme Court, however, held that it does. Id. at 930. But the Court went on to caution as follows:

> This is not to say, of course, that every entry must be preceded by an announcement. The Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.

Id. at 934.

Finally, the Court noted that historically the requirement of knock and announce "would yield under circumstances presenting a threat of physical violence." The Wilson court, stating that "law enforcement interests may also establish the reasonableness of an unannounced

entry," concluded that, ". . . we leave to the lower Courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment." Id. at 936.

In the circumstances of the present case, the Court finds that the unannounced entry into the apartment to execute an arrest warrant was reasonable under the Fourth Amendment, based on law enforcement's interest in officer safety. Kingsbury and Tarwarter were aware of the defendant's criminal history of violence, firearm possession and shootings. More significantly, Kingsbury had knowledge of the defendant's history of using a weapon when confronted by law enforcement personnel, based on the "shoot out" between police and Hardin in the time frame of approximately 1996 (after which Hardin spent approximately ten (10) years in prison). Given that knowledge, for the officers to knock and announce their presence would have been dangerous, and perhaps even foolhardy.

The officers did shout "police" and "down on the ground" as they entered the apartment. The Court finds that this manner of announcement was reasonable under the totality of the circumstances in this case and satisfied the requirements of the Fourth Amendment.


C. **Search of Hardin**

Tarwarter searched the defendant's person after arresting him and placing him in handcuffs. This search yielded crack cocaine, marijuana, and currency. The Court finds that this search of the defendant's person was a valid search incident to arrest. See Chimel v. California, 395 U.S. 752, 762-63 (1969) (holding that a defendant may be searched incident to an arrest without violating the Fourth Amendment).

### D. **Protective Sweeps by Kingsbury and Turner**

The government contends that once the officers were inside the apartment, Kingsbury conducted a valid protective sweep of the immediate area where the defendant was being arrested, specifically, by looking under the couch cushions. This search yielded a firearm under the cushion, which the government argues was within reach of the defendant, and which the defendant possibly could have obtained had Tarwarter not succeeded in securing him.

The defendant counters that Hardin was handcuffed and secured immediately, while on the floor, and that it would have been impossible for him to reach under the couch cushion for a weapon. The defendant also argues that Kingsbury left the gun where he found it, and that if the gun really posed a threat to officer safety, he would not have done so.

It is well-settled that a search conducted incident to an arrest may include not only the defendant's person, but also the area from within which the defendant might have obtained a weapon. Chimel v. California, 395 U.S. 752, 763 (1969). As stated by the Chimel court, "a gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested." Id.

In addition, the protective sweep search of a dwelling incident to the arrest of a person in the dwelling is permissible to protect the safety of the arresting police officers. Maryland v. Buie, 494 U.S. 325 (1990). The search must be narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Id. at 335-336. See United States v. Bass, 315 F.3d 561 (6th Cir. 2002) (where officers were unsure whether the arrested defendant was the shooter they were seeking, they were justified in inspecting areas of the apartment in which another person could have been hiding), cert. denied, 537 U.S. 1241 (2003).

The government directs the Court to the recent case of United States v. Hernandez, No. 05-CR-485-6, 2006 WL 200513 (N.D. Ill. Jan. 20, 2006). In Hernandez, federal agents with a valid arrest warrant arrested the defendant inside of an apartment. The apartment was leased by a third party, but apparently the defendant stayed there occasionally as a guest. The government agents conducted a protective sweep of the apartment incident to the arrest, which yielded, among other items, a gun under a couch cushion. The Court found that the gun "was within grabbing distance of the defendant at the time of the arrest" and was lawfully seized. The Court stated that, as a general rule, "police have a right to conduct a limited search for weapons and possibly yet undiscovered individuals."

In the present case, the government argues that the protective sweep searches conducted by Kingsbury and Turner were lawful, "text book" searches, because they were limited in scope and were performed for officer safety and not to gather evidence. The Court agrees. The testimony established that Kingsbury conducted a search of the immediate area where the defendant was found while Tarwarter was in the process of handcuffing and securing the defendant. The search of the couch cushions within arms length of where the defendant was sitting at the time the officers entered the apartment is a reasonable search to look for a weapon. When Kingsbury found the weapon under the couch cushion, he put himself between the weapon and the defendant. Only then did Kingsbury see that Tarwarter had secured the defendant. Kingsbury then decided that he could safely leave the weapon where he found it until it was photographed. That decision does nothing to invalidate Kingsbury's search, which occurred during the mere moments it took to handcuff and secure the defendant.

22

The Court further finds that Turner's limited search of the rest of the apartment was reasonable and lawful. Turner prudently looked under the bed for the sole purpose of checking for undiscovered persons who might pose a threat to officer safety. Turner could not see under the bed without lifting the sham, or bed skirt. When he did, the two firearms were in plain view in an open box. At that point, the firearms lawfully were seized. See United States v. Wickizer, 633 F.2d 900, 902 (6th Cir. 1980), cert. denied, 450 U.S. 935 (1981) (rifles in "plain view" during the execution of an arrest warrant were properly seized).

Finally, as to whether the defendant "owned" or "possessed" one or more of the three seized guns, this is an issue for trial. It is not a basis upon which the evidence of the guns may be suppressed. United States v. Calandra, 414 U.S. 338, 347 (1974).

## III. CONCLUSION

After carefully considering the evidence introduced during the course of the evidentiary hearing, and after reviewing the relevant legal authorities, it is clear that there is no basis to suppress any evidence seized in this case. For the reasons set forth herein, it is **RECOMMENDED** that defendant's Motion to Suppress Evidence [Doc. 18] be **DENIED**.[2]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[2]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).